## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| DWANANA E. BROOKS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION No. 4:09-cv-2806 |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| Commissioner of Social Security, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

Plaintiff Dwanana E. Brooks brought this action pursuant to 42 U.S.C. § 405(g) for review of the final determination by Social Security Administration Commissioner Michael J. Astrue ("Commissioner") that she is not entitled to receive Title XVI supplemental security income ("SSI") benefits. Before this Court is Brooks' Motion for Summary Judgment Brief (Dkt. 13) and the Commissioner's Response (Dkt. 17, 18). Having considered the parties' briefing, the applicable legal authorities, and all matters of record, Brooks' motion is **denied** and summary judgment is **granted** for the Commissioner.

## I.    BACKGROUND

Brooks is a 49-year old woman.  (Tr.  at 29). After applying for disability benefits, Brooks performed work at multiple jobs including as a day laborer, janitor,[1] and as a

---

[1]    Brooks was a school custodian for a little over a month.  After falling at work, she received worker's compensation for approximately three months.  (Tr. at 632).

Wal-Mart[2] and Subway employee.[3]   Brooks lives with her boyfriend and besides intermittent employment, her only other form of income was a settlement payment from Walgreen's for mistakenly giving her the incorrect medication. (Tr. at 631).

Brooks initially filed an application for Supplemental Social Security Income under Title XVI of the Social Security Act ("the Act") in December 2003.   In her application, she claimed that she was disabled with an onset date of April 22, 2000. (Tr. at 55).   However, the application did not list the cause of her disability. (Tr. at 21, 55). The Social Security Administration denied her claim for SSI payments.   Later that year, Brooks filed a request for reconsideration alleging that her condition had worsened.   (Tr. at 38, 61, 65).   After considering the request, the administration again denied her claim. Next, Brooks requested a hearing by an administrative law judge ("ALJ").   (Tr. at 42). At this hearing, Brooks appeared with her attorney and gave testimony at the hearing. The ALJ heard testimony from an impartial vocational expert witness, but did not hear from a medical expert.  (Tr. at 20).

Following the hearing, the ALJ issued his decision that Brooks was not disabled. (Tr. at 20).   The ALJ determined that Brooks suffered from medically determinable impairments comprised of "degenerative disc disease of the lumbar spine, depression, a history of a removal of a brain tumor and a history of substance abuse—cocaine and alcohol, in remission." (Tr. at 21).   He determined that these impairments were "severe"

---

[2]      Brooks worked as a temporary Wal-Mart employee for four days during the store's remodel.   While working, she was injured when a box dropped on her hand.   Brooks received six weeks of worker's compensation and underwent carpal tunnel surgery. (Tr. at 630-631).

in that they significantly limited Brooks' physical or mental ability to do basic work activity, but that, in light of her residual functional capacity, Brooks was able to perform her past relevant work as a fast food worker, a cafeteria attendant and a housekeeper. (Tr. at 27).  Accordingly, he determined that she did not suffer from a disability under the Act and thus she was not entitled to benefits.

Brooks requested a review of that decision and her request was denied by the Appeals Council.  (Tr. at 5).  After that ruling became final, Brooks filed suit in this court to challenge the denial of benefits. United States Magistrate Judge Mary Milloy granted Brooks' motion for summary judgment on the grounds that the ALJ had failed to fully develop the record as to her physical and mental impairments.  Because no medical expert testified at the hearing, the case was remanded to the ALJ so that the record could be more fully developed in large part

After remand, the Commissioner sent Brooks for an additional physical and mental evaluation to develop the record as instructed and a second hearing was held.  (Tr. 623)  An impartial vocational expert and an impartial medical expert testified at this hearing and additional evidence was submitted into the record.  Following the hearing, the ALJ issued his second decision, again finding that Brooks was not disabled.  (Tr. at 610).  The ALJ found that Brooks had the following severe impairments: "degenerative disc disease, status post meningioma (brain tumor) removal, peripheral neuropathy, obesity, status post carpal tunnel release, substance abuse in remission, a cognitive

---

[3]     Brooks worked at Subway for "about a month." (Tr. at 633).    She claims she quit because her manager accused of her stealing. (*Id.*).

disorder, and depression." (Tr. at 612)  However, the ALJ did not find that these impairments—even in combination—met or equaled a listing in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.*).  The ALJ found that Brooks had the residual functional capacity ("RFC") to perform light work, lifting and carrying 20 pounds occasionally and 10 pounds frequently, with an option of sitting or standing; was able to walk 3 hours in an 8-hour workday and had unlimited ability to push and pull and unlimited gross and fine dexterity; was able to occasionally climb stairs but unable to do any running or climbing of ladders, ropes or scaffolds; able to bend, stoop crouch, crawl, twist and squat; was unable to be exposed to unprotected heights or dangerous moving machinery; and was able to get along with others, understand simple instructions, concentrate on and perform simple tasks and respond and adapt to changes in the workplace and supervision.  (Tr. at 615).  The ALJ found that, in light of her RFC and limitations, Brooks was not able to perform any of her past relevant work as a laborer or janitor.  (Tr.  at 619).  But considering Brooks' age, education, work experience and RFC, the ALJ found that there were jobs existing in the national economy that Brooks could perform, and that she therefore was not disabled.  (Tr. at 621).    Brooks requested review by the Appeals Council of this second decision, and her request was denied.  She has now appealed to this Court and filed a motion for summary judgment arguing that the ALJ's decision is in error.

## II.    Medical Evidence of Brooks' Mental Impairments[4]

On August 31, 2004, Brooks arrived at the Harris County LBJ Hospital emergency room complaining of a "bump in her right eye" and "slight blurred vision." (Tr. at 403). Brooks also complained of a "migraine headache" and a "3-week history of left chest pain originating in left upper extremity and radiating to left anterior chest." (*Id.*). The physical examination revealed a "stye of [the] right upper eye-lid" and memory lapse. (Tr. at 402).  Brooks was diagnosed with a "right eye sty [sic]," and prescribed Piloxam and Tylenol Extra Strength. (Tr. at 404). The next morning, prior to discharge, Brooks "complained of auditory hallucinations, and thoughts of 'hurting herself [a] few months ago." (Tr. at 398, 403). As a result, Brooks had three psychiatric consultations while in the hospital.  The first consulting physician detailed Brooks' reported hallucinations. (Tr. at 400). "The 'voices' she hears are replays/flashbacks of [physical/sexual abuse in childhood], and occur primarily when she is with a man or in another stressful situation." (*Id.*). "The memories have driven her to suicide attempts many times in her life (overdoses, risk taking, wrist slashing, etc.), but she doubts she would try anything now (especially since her religious rebirth)." (*Id.*). Brooks reported "sadness, feelings of hopelessness, and guilt." (*Id.*). The psychiatrist diagnosed Brooks as suffering from "PTSD" and "polysubstance dependence (in remission)." (*Id.*).

The second consulting psychiatrist noted that Brooks "enjoys fishing, going to

---

[4]    The medical background of Brooks' physical impairments was discussed in extensive detail in *Brooks v. Astrue. See Brooks v. Astrue*, No. 4:06CV3910 (S.D. Tex. March 27, 2008). Because Brooks does not challenge any of the ALJ's findings with respect to her physical

Walmart, goes to church each Sunday [and] takes walks." (Tr. at 398). According to this doctor, Brooks was employed "at Subway" for two weeks in 1997, and "quit because [she] fought with coworkers." (*Id.*). Brooks had "no previous job for [seventeen] years (except dealing drugs)." (*Id.*). This doctor also noted Brooks' "dysphoric mood," and likewise diagnosed her as suffering from "post traumatic stress disorder." (*Id.*). The third consulting psychiatrist agreed with this diagnosis. (Tr. at 396).

The earliest medical record of Brooks' treatment at the Mental Heath-Mental Retardation Authority of Harris County ("MHMRA") is a "Progress Note," dated September 20, 2004. (Tr. at 271). Brooks' Care Coordinator, Christopher McKinney, met with her to monitor her "response to treatment." At that time, Mr. McKinney noted no "apparent" progress toward her goals. (Tr. at 271). On September 21, 2004, Brooks' treating physician at MHMRA, Chantee Vavasseur, M.D. ("Dr. Vavasseur"), conducted a psychiatric assessment. (Tr. at 260). "Prior to being placed on medications [Brooks complained of] a persistently depressed mood, hopelessness, helplessness, worthlessness, low self-esteem, crying spells, poor concentration, poor energy, poor motivation, poor sleep (frequent awakenings), increased appetite with [a] 25 pound weight gain in 6 months, social isolation, anhedonia, and suicide ideations with one attempt by overdose a long time ago." (*Id.*). After taking medications, Brooks continued to complain of sleeping problems and hallucinations. (*Id.*). Dr. Vavasseur noted that Brooks had "completed 9[th] grade[,] was in Special Education classes for learning[,] is illiterate [and] did not get her

impairments in the instant case, it is not necessary for the Court to revisit that evidence in this opinion.

6

GED." (Tr. at 262). She also noted that Brooks' "past occupations include: food service, housekeeper [and] retail sales." (*Id.*). Dr. Vavasseur found that Brooks' "Mental Status Evaluation" ("MSE") "is significant for difficulty attending to tasks and following directions [and her] cognitive problems could be due to borderline intelligence with the added insult of a serious brain injury." (Tr. at 263). Dr. Vavasseur also found that Brooks "is motivated for treatment but needs support as she functions in a low range." (Tr. at 263).

According to Dr. Vavasseur, Brooks' "symptoms are consistent with a diagnosis of 1) Major Depression Recurrent with psychosis [and] 2) Polysubstance Dependence—in remission." (*Id.*). Dr. Vavasseur prescribed Zoloft for depression and Seroquel for psychosis. (Tr. at 264). Dr. Vavasseur then conducted a "Five Axis DSM Diagnosis." (Tr. at 265). Under "Axis I: Clinical Disorders," Dr. Vavasseur concluded that Brooks suffered from the following conditions: (1) major depression disorder, recurring with psychotic features, and (2) polysubstance dependence. (*Id.*). Under "Axis II: Personality Disorders and Mental Retardation," Dr. Vavasseur found that Brooks had only borderline intellect. (*Id.*). Under "Axis III: General Medical Conditions," Dr. Vavasseur noted Brooks' history of benign brain mass. (*Id.*). For "Axis IV: Psychosocial and Environmental Problem," Dr. Vavasseur included Brooks' "economic problems," problem with "primary support group," problems with "access to health care," and "educational problems." (*Id.*). Finally, under "Axis V: Global Assessment of Functioning (GAF)," Dr. Vavasseur assessed a Global Assessment of Functioning ("GAF)" of 41.

The next available MHMRA record is a "Medication Maintenance" record, dated

October 20, 2004. (Tr. at 517). On that chart, Dr. Vavasseur reported Brooks' "primary current" diagnosis as major depressive disorder with psychotic features. (Tr. at 517, 519). According to Dr. Vavasseur, Brooks had a "partial" response to medication, with "50-75%" decrease in symptoms. (Tr. at 518). Brooks, at that time, reported a "decrease in feelings of depression[,] hopelessness, helplessness, and worthlessness." (*Id.*). Although Brooks stated that she still had "occasional crying spells," she also claimed increased energy and "an interest in doing things again." (*Id.*). Dr. Vavasseur increased Brooks' dosage of Zoloft and Seroquel in an attempt "to reduce her remaining symptoms." (Tr. at 519).

On October 29, 2004, Brooks returned to the Neurosurgery Clinic for a follow up regarding her "meningioma resection." (Tr. at 553). She complained of "migraines," and claimed that over-the counter pain medications were not effective in alleviating her headaches. (*Id.*). On November 16, 2004, Brooks visited the Orthopedic Evening Clinic, and complained of "right knee pain," "left shoulder pain, "left lower extremity burning," "lower back pain [LBP]," and "weakness" in her lower extremities. (Tr. at 552). Brooks' attending physician, Timothy Baker, M.D., ordered several knee x-rays, which revealed "[n]o acute fractures or dislocations." (Tr. at 550). An x-ray of her shoulder was "normal." (Tr. at 549). The CT of her head showed "[n]o acute intracranial abnormalities [n]o enhancing abnormalities to suggest residual or persistent tumor along the left frontal convexity [and] left posteroparietal post-surgical craniotomy defects [were] seen in this region through resection to what is presumed to be a frontal meningioma." (Tr. at 547). Dr. Baker diagnosed Brooks as suffering from "LBP with radiculopathy." (Tr. at 552).

8

On December 15, 2004, Brooks re-visited MHMRA, and told Dr. Vavasseur that she was "getting better." (Tr. at 505). She also mentioned that her "energy ha[d] improved," she was "interested in doing things again," and that she had "been fishing again." (*Id.*). On that date, Dr. Vavasseur observed that Brooks had not had "frequent auditory or visual hallucinations," but that they still occurred. (*Id.*). Dr. Vavasseur did remark on a significant decrease in Brooks' paranoia. (*Id.*). She changed Brooks' anti-psychotic prescription from Seroquel to Abilify, due to a complaint of acne with Seroquel. (Tr. at 507). There was no change to Brooks' Zoloft prescription. (*Id.*).

On February 9, 2005, Brooks returned to MHMRA for another assessment. (Tr. at 498). On that date, she reported a recent "increase in crying spells," a decrease in energy, "intermittent auditory hallucinations," and "intermittent visual hallucinations of shadows." (*Id.*). As a result, Dr. Vavasseur increased Brooks' dosage of Abilify for her psychosis, but did not change the Zoloft dosage. (Tr. at 500). Brooks also complained of "intermittent hot flashes and chest pains" (Tr. at 498.).

During an April 6, 2005 visit to MHMRA, Brooks reported improved "energy and motivation," no recent instances of "auditory or visual hallucinations," and no paranoia. (Tr. at 493). Brooks also mentioned that she "concentrates well enough to watch TV," and that she "enjoys going fishing with a friend." (*Id.*). Dr. Vavasseur did not change the dosage of either prescribed medication. (Tr. at 495). Brooks did not report any changes during her June 14, 2005 visit to MHMRA, and there were no changes in her medications. (Tr. at 486).

The last full assessment by Dr. Vavasseur is dated August 23, 2005. (Tr. at 477).

During that visit, Dr. Vavasseur conducted another "Five Axis DSM Diagnosis." (*Id.*). Under "Axis I: Clinical Disorders," Dr. Vavasseur included: (1) major depression disorder with psychosis, and (2) polysubstance dependence. (*Id.*). Under "Axis II: Personality Disorders and Mental Retardation," Dr. Vavasseur again referenced Brooks' borderline intellect. (*Id.*). Under "Axis III: General Medical Conditions," Dr. Vavasseur noted Brooks' "history of benign brain and pelvic mass." (*Id.*). "Axis IV: Psychosocial and Environmental Problems" included Brooks' "economic problems," problems with "primary support group," problems with "access to health care," and "educational problems." (*Id.*). Finally, under "Axis V: Global Assessment of functioning (GAF)," Dr. Vavasseur assessed a GAF of "50." (Tr. at 478). During that visit, Brooks reported that she felt "sad at times," but not "hopeless." (Tr. at 480). She also mentioned that she had "gained some weight," prompting Dr. Vavasseur to encourage her "to walk for short periods of time 10-15 minutes 2-3 times a day rather than a 30-45 minute walk to minimize stress on her back but increase her metabolism and promote health." (Tr. at 481). Brooks told the doctor she was still fishing and that she did "chores at home to keep busy." (Tr. at 480). There were no other reported changes in her symptoms since her previous visit. (*Id.*)

On remand, Brooks was evaluated by Dr. Mark Lehman, Ph.D.  Dr. Lehman found that Brooks had moderate restrictions on her abilities to understand, remember, and carry out simple instructions; and to make judgments on simple work related decisions.  (Tr. at 740-41).  He stated that Brooks had marked restrictions on the abilities to understand, remember and carry out complex instructions and to make judgments on complex work

related decisions. (*Id.*). Dr. Lehman stated that Brooks had mild restrictions on the abilities to interact appropriately with the public, supervisors, and co-workers. Finally, he stated that Brooks had a mild restriction on the ability to respond appropriately to usual work situations and to changes in a routine work setting. (*Id.*).

## III.   SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp.*, 477 U.S. at 322–23; *Weaver v. CCA Indus., Inc.,* 529 F.3d 335, 339 (5th Cir. 2008). "An issue is material if its resolution could affect the outcome of the action. A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *DIRECTV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005) (internal citations and quotation marks omitted).

## IV.   STANDARD OF REVIEW

When judicially reviewing a determination that an applicant is not entitled to benefits, we determine "(1) whether the Commissioner applied the proper legal standard;

and (2) whether the Commissioner's decision is supported by substantial evidence."
*Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002); *see also* 42 U.S.C. § 405(g)
(2010).  "Substantial evidence is more than a scintilla, less than a preponderance, and is
such relevant evidence as a reasonable mind might accept as adequate to support a
conclusion." *Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990).  A finding of no
substantial evidence is warranted only "where there is a conspicuous absence of credible
choices or no contrary medical evidence." *Johnson v. Bowen*, 864 F.2d 340, 343–44 (5th
Cir. 1988) (internal quotation marks and citation omitted).  The court may not re-weigh
the evidence in the record, nor try the issues de novo, nor substitute the court's judgment
for the Commissioner's, even if the evidence preponderates against the Commissioner's
decision. *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988).

## V.    DISABILITY EVALUATION

The Commissioner employs a five-step inquiry to determine whether a claimant is
disabled and thus entitled to disability benefits:

1. Is the claimant engaged in substantial gainful activity, i.e. working?  If so, the
   claimant is not disabled.  If not, the inquiry proceeds to question two.

2. Does the claimant have a severe impairment?  If not, the claimant is not
   disabled.  If so, the inquiry continues to question three.

3. Does the severe impairment meet or equal one of the listings set forth in
   regulation known as Appendix 1?  If so, the claimant is disabled.  If not, the
   inquiry continues to question four.

4. Can the claimant still perform past relevant work?  If so, the claimant is not
   disabled.  If not, the inquiry proceeds to question five.

5. Considering the claimant's age, education, work experience, and residual functional capacity, is there work that the claimant can do?  If so, the claimant is not disabled.  If not, the claimant is disabled.

See 20 C.F.R. § 404.1520(a)(4)(I)-(v) (2009); *Newton v. Apfel*, 209 F.3d 448, 453 (2000).

At the first four steps, the claimant bears the burden of proof; at the final step, the Commissioner does.  *Waters*, 276 F.3d at 718.

## VI.   ANALYSIS

Brooks claims that she became disabled on April 22, 2000, "as a result of cervical degenerative disc disease, depression, brain tumor removal, migraine headaches, neuropathy, and borderline intellectual functioning." (Pl.'s  Motion at 1). She asks this Court to reverse the Commissioner's decision to deny her disability benefits, and to render a judgment in her favor, for a number of reasons.

First, in several issues, Brooks claims that because the ALJ failed to find that her mental impairments of "borderline intellectual function and migraine headaches were 'severe,'" his hypothetical question to the vocational expert was erroneous.  Brooks then argues that the ALJ erred in determining that she did not meet the requirements for Listings 12.02 (organic mental disorders) and 12.05 (mental retardation) because the ALJ failed to properly consider her most recent examining physician's opinion and obtain an additional expert to examine medical equivalency. (Pl.'s Motion at 5, 6-9).   Finally, Brooks challenges the ALJ's credibility determination and the ALJ's failure to discuss the side-effects of her medications as erroneous.[5]  The Commissioner contends that

---

[5]   Preliminarily, the Court notes that the Commissioner's brief does not respond directly to these arguments.   Rather, the Commissioner's global response broadly argues that the ALJ

substantial evidence supports the ALJ's final decision. (Def.'s Response at 2, 5).  The Court treats each argument in turn.

###### A.        Severity Evaluation

First, Brooks asserts that the ALJ failed to adequately consider Dr. Lehman's assessment of her borderline intellectual functioning and the ALJ failed to find this impairment as severe.  Next, Brooks argues that the ALJ failed to adequately consider her subjective complaints regarding her migraines and the ALJ failed to find this impairment as severe.  The Court disagrees.

An impairment is not severe if it is "a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985).  In the applicable law section of his decision, the ALJ correctly set forth this legal standard by stating "[a]n impairment or combination of impairments is 'not severe' when medical and other evidence establish only a slight abnormality or a combination of abnormalities that would have no more than a minimal effect on an individual's ability to work." (Tr. at 611). The ALJ then applied this standard to find that Brooks had several severe impairments including: "degenerative disc disease, status post meningioma removal, peripheral neuropathy, obesity, status post carpal tunnel release, substance abuse in remission, a cognitive disorder and depression." (Tr. at 612).

applied the correct legal standards, and his decision that Brooks could perform light work was supported by substantial evidence.  The Commissioners response—which lacks a cogent analysis and supporting record citations—is wholly inadequate and is an unnecessary burden on this Court's efficiency and resources.

The ALJ also correctly applied the *Stone* standard to determine that Brooks' borderline intellectual functioning and migraine headaches were not severe.

*Borderline Intellectual Function*

In this case, the ALJ adequately addressed the evidence of Brooks' borderline intellectual function in finding that this impairment was not severe. The ALJ specifically referenced Dr. Lehman's psychological consultative evaluation, and noted that Brooks' test "scores placed [her] within the borderline range of intellectual functioning." (Tr. at 618). The ALJ also acknowledged Dr. Lehman's observations regarding Brooks' ability to understand remember and carry out simple instructions and interact in the workplace. The ALJ noted Brooks:

> Had moderate restrictions on her abilities to understand, remember, and carry out simple instructions; and to make judgments on simple work related decisions. He stated that Brooks had marked restrictions on the abilities to understand, remember and carry out complex instructions and to make judgments on complex work related decisions. Dr. Lehman stated that the claimant had mild restrictions on the abilities to interact appropriately with the public, supervisors, and co-workers. The claimant had a mild restriction on the ability to respond appropriately to usual work situation and to changes in a routine work setting.

(Tr. at 619). Further, the vocational expert's testimony and the hypothetical posed by the ALJ were both based on the assumption that Dr. Lehman's assessment was true.

Contrary to Brooks' assertions, the Court finds that it was not error for the ALJ to reject Dr. Lehman's diagnostic impression that Brooks experienced borderline intellectual function. (Tr. at 738). It is well settled that an ALJ may refuse to credit a

physician's diagnosis if it is unsupported by the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994). Dr. Lehman was not Brooks' treating physician and only saw Brooks one time at the request of her lawyer. The ALJ gave several cogent reasons, supported by the evidence, why Dr. Lehman's "opinion [was] inconsistent with the residual functional capacity." (Tr. at 619). These reasons included the fact that Brooks' statements lacked credibility and she showed only a mild restriction in daily living. (Tr. at 613). Finally, both the ALJ and Dr. Lehman determined that there was evidence that tended to show that Brooks exaggerated the degree to which she was limited by her impairments. (Tr. at 619).

### *Migraine Headaches*

Brooks next complains that the ALJ erred by failing to find her migraines as a severe impairment. (Pl.'s Motion at 5). Identifying severe impairments is a step-two determination. *Stone*, 752 F.2d at 1101. As the party with the burden, Brooks was required to show that headaches significantly limit her physical or mental ability to do basic work activities. Brooks did not make this showing. The only evidence about migraines is Brooks' subjective complaints. "The ALJ must consider subjective evidence of pain, but it is within his discretion to determine the pain's disabling nature. Such determinations are entitled to considerable deference." *Wren v. Sullivan*, 925 F.2d 123, 128 (5th Cir. 1991). Other than Brooks' testimony at the hearing that she was unable to work due to headaches and that she had blackouts, became dizzy and lost her balance, the only other references in the record about migraines are two notes in 2004, where physician's at the Harris County Hospital District noted that Brooks [subjectively]

16

complained of migraine headaches. *See* (Tr. at 414, 638) (8/31/2004; "patient also complains of migraine headaches"); (Tr. at 553; 10/29/04 "complains of migraines"). Neither physician made a diagnosis relating to the migraines or prescribed treatment. Brooks did not carry her burden to show that migraines significantly limit her physical or mental ability to do basic work activities. Thus, the ALJ did not err in this step-two determination.

**B.**      **Listings 12.02 and 12.05**

Brooks also asserts that the ALJ's decision is erroneous because her mental impairment meets or equals the requirements of Listings 12.02, which pertains to organic mental disorders, and 12.05, which pertains to mental retardation. (Pl.'s Motion at 6-7). Additionally, Brooks contends that the ALJ failed to sufficiently address her IQ scores found in her Psychological Evaluation prepared by Dr. Lehman and in particular, its impact on Listing requirements 12.02(c)[6] and 12.05(c)(3)[7].

---

[6]      Under 12.02, the required level of severity is met when either (1) the criteria of both paragraphs "A" and "B" are satisfied, or (2) when the requirements of paragraph "C" are satisfied. Paragraph A may be satisfied by a "[d]emonstration of a loss of specific cognitive abilities or affective changes and the medically documented persistence" of "[d]isorientation to time and place," "[d]isturbances in mood," or "[e]motional ability," among others. Paragraph B may be satisfied by showing marked limitations or repeated episodes of decompensation in at least two of the four mental functioning areas. Alternatively, Paragraph C may be satisfied through a medically documented history of a chronic organic mental disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities" and a current history of "1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement." 20 C.F.R. pt. 404, subpt. P, app. I, § 12.02.

[7]      To meet Listing 12.05 for mental retardation, an individual (1) must have "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22" and (2) must satisfy the criteria listed in Subsection A, B, C, or D.

If a claimant meets a listing, she will be found disabled regardless of her age, education, or work experience. 20 CFR § 404.1520(d); *see also Bowen v. Yuckert*, 482 U.S. 137, 141, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987) ("If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled"). A diagnosis alone is insufficient to meet a Listing. 20 C.F.R. §§ 404.1525 (d) (2011). ("Your impairment(s) cannot meet the criteria of a listing based only on a diagnosis"). Instead, "[t]o meet the requirements of a listing, you must have a medically determinable impairment(s) that satisfies all of the criteria in the listing." *Id; see also* 20 C.F.R. §§ 404.1525(c)(3) (2011) (noting that an impairment must also meet "any relevant criteria in the introduction").

In this case, the medical evidence does not support a finding that Brooks met or equaled any listed impairment. State agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act. 20 C.F.R. § 416.927(f)(2)(I) (2011). Here, there is medical evidence from consulting psychologist Dr. Lehman that Brooks did not meet the requirements of any Listing because she experienced only mild restrictions

---

20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05.   Section C of Listing 12.05 is met if a claimant has "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Id*. In order to meet the Listing, Plaintiff must satisfy both the general requirements and the specific"C" criteria.  *Id.* at § 12.05(C).  In addition, the "C" criteria requires significant functional limitations in the areas of daily living, social functioning, concentration, persistence or pace and episodes of decompensation. *See* 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3). Those functional limitations must be rated in severity. *See* 20 C.F.R. §§ 404.1520a(d), 416.920a(d). Finally, the findings must be documented. *See* 20 C.F.R. §§ 404.1520a(e), 416.920a(e).

in her activities of daily living, as well as only moderate difficulties maintaining social functioning. (Tr. at 613).

Dr. Lehman, a psychologist chosen by the Social Security Administration, performed a psychological consultative examination of Brooks on July 16, 2008.  Dr. Lehman administered two intelligence and psychological tests, including the Wechsler Adult Intelligence Scale-III and the Wide Range Achievement and obtained a full scale IQ score of 69, a verbal IQ score of 69, and a performance IQ score of 75. (Tr. at 738.) Based upon Brooks' examination, Dr. Lehman diagnosed Brooks with cognitive disorder, depressive disorder, borderline intellectual functioning, chronic pain, limited finances, and a Global Assessment of Functioning ("GAF") [8]of 48.[9] Although Dr. Lehman diagnosed Brooks with the above, he did not conclude that these conditions rendered Brooks "disabled."[10] Overall Dr. Lehman made the following prognosis:

---

[8]     GAF is a standardized measure of psychological, social, and occupational functioning used in assessing a patient's mental health. *See Boyd v. Apfel*, 239 F.3d 698, 700 n. 2 (5th Cir. 2001). The GAF scale ranges from 100, denoting superior functioning, to 1, indicating that the patient is in persistent danger of severely hurting herself or others, has a persistent inability to maintain minimal personal hygiene, or has engaged in a serious suicidal act with a clear expectation of death. AM. PSYCHIATRIC ASS'N., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 1994).

[9]     A GAF Score in the range of 41 to 50 represents "[s]erious symptoms" (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Brown v. Barnhart*, 285 F. Supp. 2d 919, 924 n. 7 (S.D. Tex. 2003) (citing AM. PSYCHIATRIC ASS'N., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 1994).

[10]     Brooks also argues that the ALJ erred by failing to give controlling weight to Dr. Lehman's opinion. Even if Dr. Lehman had found that Brooks was disabled, the ALJ would not have been required to give Dr. Lehman's opinions "controlling weight" under the regulations since Dr. Lehman was not Brooks' treating physician but instead a consultative psychologist who examined Brooks on one occasion. *See* 20 C.F.R. §§ 416.902 & 416.927(d)(2) (2011). While the regulations provide that all medical opinions are to be considered in determining the disability

> Ms. Brooks' cognitive status is stable. No improvement or deterioration is
> expected. Her depression would likely respond to treatment.

*See* Psychological Examination by Dr. Lehman. (Tr. 734-742.) Dr. Lehman further

opined that "in spite of her limited test scores, it is nonetheless felt that Brooks can

manage a benefit check in her own behalf." (Tr. at 738.)

The record reflects that the ALJ recognized Brooks' mental limitations and

accordingly, limited her RFC to unskilled light work with the ability to understand and

carry out only simple instructions. (Tr. at 621.) In his opinion, the ALJ discussed Dr.

Lehman's findings in great detail, including Dr. Lehman's diagnoses and observations.

In fact, the ALJ agreed with Dr. Lehman's findings with regard to Brooks' cognitive and

depressive disorder. (Tr. at 618.) At the January 2009 hearing, the ALJ noted that Brooks

worked several jobs after her brain tumor removal, and there was no evidence that her IQ

level affected her ability to do work. (Tr. at 677.)

While the ALJ found that Brooks suffered from some mental impairments, he did

not find that Brooks' mental impairments were disabling. Instead, he reasoned that

insofar as Dr. Lehman's opinion was inconsistent with an RFC for "light work" it was not

entirely supported by the full evidence in the record. (Tr. at 619). The ALJ found that

---

status of a benefits claimant, 20 C.F.R. §§ 404.1527(b), 416.927(b), opinions on ultimate issues,
such as disability status, are reserved exclusively to the ALJ. 20 C.F.R. §§ 404.1527(e)(1),
416.927(e)(1)(2011). The ALJ has the sole responsibility for determining a claimant's disability
status and the ALJ "will not give any special significance to the source of an opinion on issues
reserved to the Commissioner" including a claimant's residual functional capacity, which is a
finding expressly reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e)(2011); *Cain v.
Barnhart*, 193 Fed. Appx. 357, 360 (5th Cir. 2006). Based upon the foregoing, the Court finds
that the ALJ did not err in failing to find that Brooks was not capable of performing light work
based on her mental impairments.

Brooks' mental condition responded to treatment, she had increased energy and she had been fishing again. (*Id.*) On several occasions, Brooks reported that she was feeling better and moreover, Dr. Lehman reported that Brooks' condition would respond to treatment. (*Id.*) While Brooks' scores placed her within the borderline range of intellectual functioning, Dr. Lehman noted that there was "evidence of exaggeration in her responses and an effort to minimize her actual mental abilities." (Tr. at 619.)

Further, contrary to her arguments Brooks' below-average intelligence tests do not demonstrate that she is disabled. *See Selders v. Sullivan*, 914 F.2d 614, 619 (5th Cir. 1990) (holding that claimant's below-average IQ of 72 did not mean that claimant was entirely unable to perform light or sedentary work). As the Fifth Circuit has stated, "below-average intelligence alone does not constitute a non-exertional impairment." *Johnson v. Sullivan*, 894 F.2d 683, 686 (5th Cir. 1990). Although mental retardation qualifies as a non-exertional impairment under the Listing of Impairments, the evidence of record does not indicate that Brooks suffers from organic mental disorders or is mentally retarded. *See* 20 C.F.R. pt. 404, subpt. P, app. 1, §§ 12.02, 12.05 (2011).[11] Moreover, Brooks has failed to demonstrate that her low IQ score of 75 prevents her from

---

[11]     To meet Listing 12.05 for mental retardation, an individual (1) must have "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22" and (2) must satisfy the criteria listed in Subsection A, B, C, or D. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05. The required level of severity for mental retardation is met when the claimant has a "valid verbal, performance, or full scale IQ of 59 or less." *Id.* at § 12.05(B).

performing the jobs identified by the ALJ.[12]   Based upon the foregoing, the Court finds

that substantial evidence in the record supports the ALJ's conclusion that Brooks does

not meet Listings 12.02 and 12.05.

### C.        Hypothetical Question

Similarly, Brooks argues that the ALJ erred by relying on the vocational expert's

testimony because the hypothetical question failed to incorporate her "non-severe"

mental impairments found in the record.  (Pl.'s Motion at 11).  The Court disagrees.

A hypothetical question posed by an ALJ to a vocational expert "need only

incorporate the disabilities that the administrative law judge recognizes."  *Wise v.*

*Barnhart*, 101 F. App'x 950, 951 (5th Cir. 2004) (per curiam) (unpublished) (citing

*Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994); *Morris v. Bowen*, 864 F.2d 333,

336 (5th Cir. 1988)).  In this case, the ALJ specifically considered the list of ailments

presented by Brooks including cervical degenerative disc disease, depression, brain tumor

removal, migraine headaches, neuropathy, and borderline intellectual functioning.  (Tr. at

612).

As discussed above, Brooks has not established that her alleged borderline

intellectual functioning and migraine headaches imposed any functional limitations for

any sustained period during the relevant time period.  The ALJ applied the correct legal

standard in determining Brooks' severe impairments, and his findings are supported by

---

[12]        The vocational expert's testimony supports the ALJ's finding regarding Brooks' RFC.
Specifically, the vocational expert testified that a hypothetical individual with Brooks' educational
background, with the ability to only understand and carry out simple instructions would be able to
perform the unskilled light jobs of a laundry press operator, assembly press operator, and bottling line
attendant.  (Tr. at 621, 675).

substantial evidence.  Thus, the disabilities contained in the hypothetical are equivalent to those analyzed and recognized in the ALJ's account of Brooks' RFC.  Accordingly, the ALJ's hypothetical question was not in error.

### D.        Updated Medical Opinion Regarding Equivalency

Brooks argues that it was error for the ALJ not to obtain an updated medical expert opinion regarding medical equivalency and her RFC, given that she was found to have multiple severe impairments. Specifically, Brooks argues that the ALJ should also have consulted not just a physician ME, but also a "psych ME" to assess her medical evidence.  (Pl.'s Br. at 12.) Relying on Social Security Regulation 96-6p ("SSR 96-6p") and the holding in *Brister v. Apfel*, 993 F. Supp. 574, 578 (S.D. Tex. 1998), Brooks argues that the ALJ erred by not obtaining an updated medical opinion of a "psych ME", because here no mental health expert testified with respect to Brooks' mental impairments. Brooks contends that there is a non-discretionary requirement that the ALJ obtain an updated medical opinion regarding the cumulative effects of all severe and non-severe impairments when additional medical evidence is received that may change the State medical agency's findings. (Pl.'s Br. at 12.) This argument is unmeritorious for several reasons.

First, contrary to Brooks' arguments, SSR 96-6p[13] and the court in *Brister* leave

---

[13]        SSR 96-6p, 1996 SSR LEXIS 3 states that "the ALJ is responsible for deciding the ultimate legal question whether a listing is met or equaled." SSR 96-6p, 1996 SSR LEXIS 3, 1996 WL 374180, at *3. The ALJ is not required to get an updated medical opinion on the issue of equivalency. *See e.g.*, *Thomas v. Astrue*, No. 6:07-CV-053-C ECF, 2009 U.S. Dist. LEXIS 78128, 2009 WL 2777867, at *4-5 (N.D. Tex. Aug. 31, 2009)(unpublished) (finding that the ALJ did not err in failing to obtain an updated medical opinion on the question of medical

the decision to obtain an updated medical opinion to the discretion of the ALJ:

> It is clear that when additional medical evidence is received **that in the opinion** of the ALJ may change the State agency medical or psychological consultant's findings, an updated medical opinion regarding disability is required.

*Brister*, 993 F. Supp. at 578 n.2 (emphasis added); *see also* SSR 96-6p, 1996 SSR LEXIS 3, 1996 WL 374180, at *3. Therefore, if the ALJ believes that any medical evidence received after a medical opinion was obtained might change the State agency's findings, then the ALJ must obtain an updated opinion. If the ALJ does not believe that an updated opinion would change the State agency's findings, then the ALJ is not required to obtain an updated opinion. Brooks' argument that this decision is non-discretionary is therefore misplaced. The record reflects that the ALJ did not believe that any additional opinions were necessary to make his decision.

Second, in this case no additional medical evidence was received after the hearing which would require an updated opinion. Brooks was examined by Dr. Lehman, a state agency psychologist prior to the hearing. At the hearing, the ALJ heard testimony from Dr. Albert Oguejiofor, an impartial medical expert, who testified with respect to all of Brooks' medical impairments. Contrary to Brooks' assertions, no additional medical evidence was submitted after the hearing that would have required the "ALJ, as a lay person...to interpret raw data in [the] medical record." (Pl.'s Motion at 12).

Finally, contrary to Brooks' argument neither SSR-96-6p nor *Brister* require an

---

equivalence as to the plaintiff's visual impairments even when such issue did not arise until after the State agency medical consultant had reviewed the plaintiff's case and there was no physician or medical expert opinion in the record relating to such issue).

updated medical opinion where, as here there is substantial evidence supporting the ALJ's finding that the claimant does not meet a Listing. To be entitled to relief, Brooks must establish not only that the ALJ erred, but also that the ALJ's error casts into doubt the existence of substantial evidence to support the ALJ's decision. *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988). Here the ALJ considered Brooks' Psychological and Mental Status Evaluation, including her IQ test scores, prepared by examining psychologist Dr. Lehman and determined that she "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1". (Tr. at 612, 734). As discussed above, substantial evidence in the record supports the ALJ's conclusion that Brooks does not meet a Listing. Accordingly, the Court finds that the ALJ did not err by not obtaining an updated medical opinion under Social Security Regulation 96-6p.

### E.     Failure to Properly Develop the Case

Next, Brooks argues that her case should be remanded to the Commissioner because the ALJ's failure to obtain an updated mental health opinion from an ME amounted to a failure to properly develop the case. *Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir. 2000) (citing *Brock v. Chater,* 84 F.3d 726 (5th Cir.1996); *Kane v. Heckler*, 731 F.2d 1216 (5th Cir. 1984)). As held in *Carey v. Apfel*, an ALJ "has a duty to fully and fairly develop the facts relative to a claim for disability benefits." However, in the next sentence, the *Carey* court noted the requirement that a claimant establish prejudice:

This Court will not reverse the decision of an ALJ for failure to fully and

fairly develop the record unless the claimant shows that he or she was prejudiced by the ALJ's failure. To establish prejudice, a claimant must demonstrate that he or she "could and would have adduced evidence that might have altered the result."[14]

Although Brooks makes the vague claim that "[c]onsultation of a qualified ME at the ALJ hearing would likely have resulted in a different outcome," she provides no argument or citation in support of this assertion. Brooks' has failed to show that she was prejudiced by the ALJ's failure to consult a "psych ME." *See Lottinger v. Astrue*, 2010 U.S. Dist. LEXIS 17293 (S.D. Tex. Feb. 26, 2010) (Atlas, J.) (remand improper because claimant failed to show she was prejudiced by the ALJ's failure to consult an ME).

### F.     Activities of Daily Living

Brooks argues that the ALJ's finding that she is not disabled is "based in part on [her] limited activities of daily living" and that the ALJ's finding to that effect is therefore in error.  (Pl.'s Brief at 14).  This is an inaccurate characterization of the ALJ's consideration of the weight of Brooks' daily activities to the disability analysis.   In addition to all of the other medical evidence, the ALJ considered Brooks' daily activities as being relevant to (1) her RFC and (2) to her overall credibility of her allegations of her actual symptoms.

"The term 'residual functional capacity' is defined as the most an individual can still do after considering the physical and mental limitations that affect the ability to perform work-related tasks." *Ray v. Barnhart*, 163 Fed. Appx. 308, 312 n. 6 (5th Cir.

---

[14]     *Id.* (internal citations omitted) (quoting *Kane*, 731 F.2d at 1220).

2006) (citing 20 C.F.R. 416.945(a)(l)); *see Myers*, 238 F.3d at 620.  From the applicable

regulations, "light work" includes the following:

> lifting no more than 20 pounds at a time with frequent lifting or carrying of
> objects weighing up to 10 pounds. Even though the weight lifted may be very
> little, a job is in this category when it requires a good deal of walking or standing,
> or when it involves sitting most of the time with some pushing and pulling of arm
> or leg controls.

*Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987) (quoting 20 C.F.R.

404.1567(b)). Here, the ALJ determined that Brooks could perform a "light level

of work," after finding that she is able to "lift and carry 20 pounds occasionally

and 10 pounds frequently, with an option of sitting or standing," "able to walk 3

hours in an 8-hour workday" and has unlimited abilities to push and pull and

unlimited gross and fine dexterity." (Tr. at 614).  Citing the holding in *Mims*,

Brooks argues that "it is improper for the ALJ to conclude from the ability to

perform light household chores that [she] also retains an ability to function

consistently at or above the light exertional level." *Mims v. Califano*, 581 F.2d

1211, 1214-1215 (5th Cir. 1978); (Pl.'s Motion at 14).  Her reliance on this case to

support her arguments is misplaced.

In *Mims*, the plaintiff was found to be disabled despite retaining the

capacity for light housework, including cooking supper, making a bed, mowing

the lawn, and infrequently driving. *Mims*, 581 F.2d at 1215.  However, in this

case, unlike in *Mims*, the ALJ did not consider Brooks' limited activities of daily

living solely for his determination of her residual functional capacity, as Brooks'

alleges. Instead, he considered her ability to go "fishing once a week for

27

approximately 3 hours," her ability to "watch television, microwave meals, attend church on Sundays, take walks, and go shopping at Wal-Mart" in his assessment of her credibility, noting that "the claimant's actual activities of daily living are greater than her alleged functional limitations." (Tr. at 618.) Such inconsistencies between claims of limitations and a claimant's daily activities can be "quite relevant in evaluating [a claimant's] credibility." *See Reyes v. Sullivan*, 915 F.2d 151, 155 (5th Cir. 1990) (citing *Hollis v. Bowen*, 837 F.2d 1378, 1385 (5th Cir. 1988)). Accordingly, the Court concludes, on this record, that the ALJ did not err in considering Brooks' daily activities for his assessment of her claims. (Tr. at 618).

### G.       Side-Effects

Finally, Brooks asserts that the ALJ erred by failing to discuss, much less consider, or make provision in the RFC assessment with regard to the side effects of her medications. (Pl.'s Motion at 16).

SSR 96-7p requires consideration of the "type, dosage, effectiveness, and side effects of any medication the individual takes of has taken to alleviate pain or other symptoms." *See also* 20 C.F.R. §§ 404.1529(c)(3)(iv) and 416.929(c)(3)(iv) (2011). Under SSR 96-8p, the RFC assessment "must be based on all of the relevant evidence in the case record," including the effects of treatment-such as side effects of medication. SSR 96-8p, 1996 WL 374184. However, a claimant's subjective complaints must also be corroborated, at least in part, by objective medical evidence. *Eovaldi v. Astrue*, 729 F. Supp. 2d 848, 861-62 (S.D. Tex. 2010); *see Wren,* 925 F.2d at 128-29; 20 C.F.R. §

404.1528; SSR 96-8p, 1996 WL 374184.

In this case, at the hearing, the ALJ asked Brooks if her medications had any side effects. (Tr. at 651). Brooks testified that the medications she takes cause "dizz[iness], drowsiness and make me sleep." (Tr. at 651). However, there is no corresponding medical testimony or other objective evidence corroborating Brooks' alleged side effects of dizziness, and drowsiness. *Eovaldi*, 729 F. Supp. 2d at 862. There is no evidence that Brooks ever reported any side effects or difficulties with her medication, and Brooks fails to point to objective evidence that establishes these alleged side effects. *Id.* Brooks' testimony alone is insufficient to establish that the ALJ should have explicitly addressed the side effects of medication on her ability to do work. *See, e.g., Hickman v. Astrue,* No. H-08-1194, 2009 WL 3190471, at *13 (S.D. Tex. Sept. 29, 2009) (unpublished) (stating that there were "no reports that Hickman complained of disabling side effects from medication" during relevant period). Accordingly, the ALJ was not required to address the alleged side effects of Brooks' medication in formulating the RFC assessment and his decision regarding the RFC assessment was not in error.

## VII. CONCLUSION

A review of the record reveals that the ALJ applied the appropriate legal standards in making this determination. Additionally, substantial evidence supports the determination that Brooks was not disabled during the relevant time period. A review of the pleadings, the discovery and disclosure materials on file, and any affidavits shows that there is no genuine issue as to any material fact in this case, and summary judgment is therefore appropriate. FED. R. CIV. P. 56(c). Accordingly, Brooks' Motion for

Summary Judgment is **denied** and the Commissioner's Motion for Summary Judgment is **granted**.

Signed at Houston, Texas on March ___31___, 2011.

George C. Hanks, Jr.
United States Magistrate Judge